IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| GENERAL ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:23-CV-06162-BCW |
| | ) | |
| BOILERMAKER-BLACKSMITH | ) | |
| NATIONAL PENSION TRUST, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Before the Court are Defendants' Motion for Summary Judgment (Doc. #24) and Plaintiff's Cross-Motion for Summary Judgment (Doc. #27). The issue before the Court is whether to enforce or vacate an arbitration decision concluding that Plaintiff was not liable for a partial withdrawal from a multiemployer pension plan. The Court, being duly advised of the premises, grants Plaintiff's cross-motion (Doc. #27), denies Defendants' motion (Doc. #24), and affirms the Arbitrator's decision.

**BACKGROUND**

On December 11, 2023, General Electric Company ("GE") filed this action against the Boilermaker-Blacksmith National Pension Trust (the "Fund") to confirm and enforce an arbitral award issued under the Employment Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). (Doc. #1). On January 10, 2024, the Fund and John T. Fultz, as a fiduciary for the Fund, ("Defendants") filed a complaint against GE to vacate the arbitration award, which was designated as Case No. 5:24-CV-06004-BCW. (Doc. #1). On March 5, 2024, the parties in these two cases, 5:23-CV-06162-BCW and 5:24-CV-06004-BCW, filed a Joint Motion to Consolidate. (Doc. #18). Consistent with

1

the parties' agreement, the Court granted the parties' Joint Motion to Consolidate. (Doc. #22). The subsequently filed Case No. 5:24-CV-06004-BCW was consolidated with the first-filed Case No. 5:23-CV-06162-BCW, the instant action. Id.

On March 20, 2024, the parties' filed a Joint Motion for Amended Scheduling Order with a proposed briefing schedule, seeking to have the claims decided through dispositive cross-motions for summary judgment. (Doc. #21). The Court granted the parties' request for an amended scheduling order and entered the proposed briefing schedule. (Doc. #23). On May 1, 2024, the Fund filed a motion for summary judgment. (Doc. #24). On June 5, 2024, GE filed a cross-motion for summary judgment and suggestions in opposition to the Fund's motion. (Doc. #27). The Fund filed suggestions in opposition to GE's cross-motion and in reply to GE's opposition suggestions. (Doc. #29). Then, GE filed reply suggestions (Doc. #32). On September 18, 2024, the Court heard oral arguments. The issue presented by the parties' motions asks what method of calculation is required to count the number of employees that work in the "building and construction industry" under § 1383 of MPPAA. See 29 U.S.C. § 1383(b)(1)(A).

## UNCONTROVERTED FACTS

GE is a multinational technology and financial-services company. (Doc. #28 at 9). GE wholly owns, directly or indirectly, APCom Power, Inc. ("APCom"), Alstom Power, Inc. ("Alstom Power"), and Atlantic Plant Maintenance ("APM"). Id. As of November 2015, APCom, Alstom Power, and APM were under the common control of GE for purposes of 29 U.S.C. § 1301(b)(1). Id. at 10. Each of these companies previously employed or currently employs unionized boilermakers. Id.

The Fund is a defined benefit multiemployer pension fund established and maintained according to the ERISA, as amended by MPPAA. Id. at 9. GE has or had obligations to contribute to the Fund pursuant to multiple collective bargaining agreements ("CBAs") and Wage Rate Sheets

2

that GE or its various employer associations entered into with Locals or affiliates of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (the "Union"). (Doc. #28 at 10).

During the period 2007–2014, GE employed boilermakers to perform both field work (work performed on a boiler system at a customer's site) and shop work (work performed at a facility operated by the employer). (Doc. #28 at 11). Field employees typically are not permanent employees of the contributing employer and work for various employers in a given geographic area to which they are tied. Id. Shop employees typically work in a single set location, and a typical shop employee will spend a majority of his or her career with a single employer. Id.

Two of GE's companies, ApCom and APM, contributed to the Fund for work performed in the field by employees covered under local, regional, and national CBAs throughout the United States. Id. at 12. In the first instance, GE calculated and remitted the amount of the pension contributions that were owed to the Fund on a monthly basis. Id. at 13. The Fund or its Third-Party Administrator then reviewed GE's contributions upon receipt. Id. APCom's and APM's boilermakers performed work in the building and construction industry for purposes of 29 U.S.C. §1383(b)(1)(A). (Doc. #28 at 17).

Alstom Power owned a manufacturing plant in Chattanooga, Tennessee, where it employed Union employees of Boilermakers Local 656 under a single-shop CBA covering only work performed at the facility. (Doc. #28 at 12). Boilermakers employed at this facility did not perform work in the building and construction industry for purposes of 29 U.S.C. § 1383(b)(1)(A). Id. at 17. GE acquired Alstom Power in November 2015 and publicly announced in June 2016 that it would be closing the Chattanooga facility. Id. On August 25, 2016, GE and Local 656 entered into a plant closing agreement. (Doc. #25-3 at 4). All operations covered by the Chattanooga CBA ceased at the end of December 2016. Id.

On March 14, 2019, the Fund issued two withdrawal liability assessments to GE. (Doc. #28 at 14). The first assessment, the "70% Decline Claim," was based on GE's alleged partial withdrawal from the Fund in 2014 through a 70% decline in contribution base units ("CBUs"). Id. For this alleged partial withdrawal, GE was assessed approximately $205 million in liability. Id.; (Doc. #12 at 4). GE submitted a timely request for review of the assessment, which the Fund denied. (Doc. #28 at 14–15). GE then demanded arbitration as provided for in ERISA. Id. at 15.

The second assessment, the "Chattanooga Claim," was based on an alleged partial withdrawal in 2016 related to the transfer of work away from the Chattanooga facility. (Doc. #28 at 14). The Fund withdrew this assessment after discovery during arbitration revealed a CBA that allegedly obliged GE to make contributions though March 2017. (Doc. #1-1 at 9). The Fund issued a new second assessment to GE in 2021 for more than $22 million based on the same conduct at the Chattanooga facility, while maintaining its 2016 claim in the alternative. Id. GE again submitted a timely request for review of the assessment, which the Fund again denied. (Doc. #28 at 14–15). GE then demanded arbitration as provided for in ERISA and requested that the same Arbitrator resolve the new claim. Id. Although the parties did not agree to consolidate the claims, the Arbitrator nonetheless addressed both claims in a single decision. (Doc. #1-1).

The Arbitrator ruled in favor of GE, finding that the Building and Construction Industry Exemption (the "BCI Exemption") applied to GE. (Doc. #1-1). The BCI Exemption relieves companies of liability for alleged "withdrawals," which occur when a company stops contributing to a pension plan within the circumstances defined by MPPAA. 29 U.S.C. § 1383(b). In his decision, the Arbitrator stated that Congress intended for the BCI Exemption to apply to companies that employed both field and shop workers (like GE), known as "mixed" employers. Id. at 11. The Arbitrator also determined that the appropriate method for calculating whether the BCI Exemption applied was "to look at employees in the aggregate over the applicable eight-year period, and to

4

determine whether substantially all of them worked construction." Id. at 15. Applying this method of calculation, the Arbitrator found that, during the relevant periods, GE had employed substantially all of the employees for whom it had an obligation to contribute to the Fund in the building and construction industry. Id. at 18. To that end, the Arbitrator found for GE on both claims. The parties now seek review of the Arbitrator's decision, specifically concerning the method of calculation used.

## LEGAL STANDARD

MPPAA allows parties to "bring an action . . . in an appropriate United States district court . . . to enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2). The district court "must accept the arbitrator's findings of fact as correct unless rebutted by a clear preponderance of the evidence." Union Asphalts & Roadoils, Inc. v. Mo-Kan Teamsters Pension Fund, 857 F.2d 1230, 1233 (8th Cir. 1988) (quoting 29 U.S.C. §1401(c)). The district court reviews an arbitrator's legal conclusions de novo. Id. (quoting 29 U.S.C. §1401(b)(2)); Seaway Port Auth. v. Duluth-Superior Pension Plan, 920 F.2d 503, 506 (8th Cir. 1990).

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden to establish that there is no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, the court evaluates the evidence in the light most favorable to the nonmoving party, and the nonmoving party is entitled to "the benefit of all reasonable inferences." Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991); White v. McKinley, 519 F.3d 806, 813 (8th Cir. 2008).

5

## ANALYSIS

### I. The Applicable Standard of Review is De Novo

GE urges this Court to take a deferential position with regards to the Arbitrator's findings of fact. (Doc. #28 at 29). In opposition, the Fund asserts that this matter presents purely a question of law, and no deference should be given. (Doc. #24 at 15); (Doc. #29 at 17). The issue disputed by the parties, for which they seek review in this Court, is whether the BCI exemption must be applied using a cumulative headcount approach, or if using monthly snapshots is permitted under 29 U.S.C. § 1383(b)(1)(A). In essence, the parties are asking this Court to determine the meaning of a statute. This is a question of statutory interpretation, which is a legal determination the Court reviews de novo. "Under MPPAA, the district court has full review of the arbitrator's legal determinations." Union Asphalts, 857 F.2d at 1233.

Furthermore, since the only disputed issue is legal, there are no disputed material facts. The question this Court must answer is which party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

### II. Withdrawal Liability Under ERISA

Congress enacted ERISA to regulate private retirement pension plans. Union Asphalts, 857 F.2d at 1232. Congress enacted MPPAA to amend ERISA, believing ERISA provided inadequate protection for multiemployer pension plans when employers stopped participating in those plans. Id. When employers terminate their participation in those plans, it places an extreme financial burden on the contribution base of the pension fund, which Congress sought to rectify by creating withdrawal liability. Id.; Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 721–22 (1984). Under MPPAA, there are two scenarios where an employer who stops contributing to a multiemployer pension plan must make a final payment to the plan to ensure its financial stability:

complete withdrawal and partial withdrawal. Id.; 29 U.S.C. § 1381(a). Here, GE is accused of making a partial withdrawal.

A partial withdrawal occurs when "(1) there is a 70-percent contribution decline, or (2) there is a partial cessation of the employer's contribution obligation." 29 U.S.C. § 1385. "There is a 70-percent contribution decline for any plan year if during each plan year in the 3-year testing period the employer's contribution base units do not exceed 30 percent of the employer's contribution base units for the high base year." Id. This is the provision of MPPAA that the Fund's 70% Decline Claim is based on. Furthermore, there is a partial cessation if, during the plan year:

> (i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location or to an entity or entities owned or controlled by the employer, or
>
> (ii) an employer permanently ceases to have an obligation to contribute under the plan with respect to work performed at one or more but fewer than all of its facilities, but continues to perform work at the facility of the type for which the obligation to contribute ceased.

29 U.S.C. § 1385(b)(2)(A). Section (i) is known as the "bargaining-out" provision, and it is the provision of MPPAA that the Fund's Chattanooga Claim is based on.

An employer's withdrawal liability is calculated based on requirements set forth in MPPAA. For a partial withdrawal, the amount is determined under 29 U.S.C. §§ 1391 and 1386 to be the amount of unfunded vested benefits allocable to the employer. 29 U.S.C. § 1381. If a multiemployer pension plan determines that a partial withdrawal has occurred, it calculates the amount of liability pursuant to the detailed requirements in MPPAA and issues an assessment of withdrawal liability, if there is any, to the employer. 29 U.S.C. §§ 1382, 1399(b)(1); Withdrawal Liability, Pension Benefit Guaranty Corporation, https://perma.cc/P682-TCBU (last visited Sep. 24, 2024). The employer may ask the pension plan to reconsider its assessment, and if the plan

7

declines to do so, the employer must demand arbitration to resolve any disputes. 29 U.S.C. § 1401(a)(1); 29 C.F.R. §§ 4221.

### III. The Building and Construction Industry Exemption

Congress determined it was necessary to create certain exceptions to MPPAA's withdrawal liability, including the "building and construction industry" exemption, or BCI Exemption. See 29 U.S.C. § 1383(b). The BCI Exemption provides that an employer operating in the building and construction industry is not liable for a complete or partial withdrawal if (1) "substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry," and (2) the plan "primarily covers employees in the building and construction industry." 29 U.S.C. § 1383(b).

The issue before the Court is whether GE qualifies for the BCI Exemption, which comes down to determining the proper method to count the number of employees working in the building and construction industry at GE during the relevant time periods.

The parties agreed to the following relevant stipulations: (1) the Fund primarily covers employees in the building and construction industry, (Doc. #25-2 at 6); (2) the relevant time frame for evaluating BCI Exemption eligibility is the eight-year period preceding each alleged partial withdrawal, (Docs. #28 at 7 and #29 at 16); (3) for purposes of applying the BCI Exemption in this matter, 85% qualifies as "substantially all," (Doc. #25-1 at 10); and (4) the parties have agreed to the monthly, yearly, and aggregate headcount numbers for the relevant periods for the Alstom Power shop workers and the APCom and APM field workers, (Doc. #28 at 17). Given these stipulations, the parties agree "the only remaining question is how to count construction and shop employees *within* each eight-year period." (Doc. #29 at 16) (emphasis in original).

### A. In Determining if the BCI Exemption Applies, the Cumulative Headcount Approach is the Proper Method for Counting Employees.

When interpreting a statute, the Court "begin[s] with the language of the statute and ask[s] whether Congress has spoken on the subject before us. If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress." Citicasters v. McCaskill, 89 F.3d 1350, 1354 (8th Cir. 1996) (quoting Norfolk & Western Ry. Co. v. American Train Dispatchers' Ass'n, 499 U.S. 117, 128 (1991)). Yet, where a statute is ambiguous, "a court seeks guidance in the statutory structure, relevant legislative history, congressional purposes expressed in the statute at issue, and general principles of law relevant to the statute at issue." United States v. E.T.H., 833 F.3d 931, 937 (8th Cir. 2016) (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 737 (1985)). The text of a statute is ambiguous if it is "capable of being understood in two or more possible senses or ways." Chickasaw Nation v. United States, 534 U.S. 84, 90 (2001) (quoting Webster's Ninth New Collegiate Dictionary 77 (1985)).

GE argues that the language of the statute is clear and plainly requires a cumulative headcount of employees over the applicable periods, and this method is the only one consistent with decades of precedent and the purposes of ERISA. (Doc. #28 at 31–41). Meanwhile, the Fund contends that the statute is ambiguous, and the most sensible method that is respectful of ERISA's purpose regarding withdrawal liability and Congress's intent concerning the BCI Exemption is a monthly headcount. (Doc. #25 at 17–25).

The relevant portion of MPPAA that this Court must interpret states that an employer can qualify for the BCI Exemption only if:

> substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry.

29 U.S.C. § 1383(b)(1)(A). As revealed by the language of the statute, it identifies that "employees" are to be counted, but it does not identify a method by which to count them.

The Fund argues that the statute is ambiguous because it lacks any description of the method by which counting is to occur. (Doc. #25 at 15). Yet, GE argues that since nothing in the text hints at measuring employees through a subset or snapshot in time, "[t]he only logical inference is that the entire relevant period must be considered as a whole." (Doc. #28 at 35). Essentially, GE points to the absence of information in the statutory text to conclude it plainly requires a cumulative headcount of all employees over the eight-year period. The Court finds GE's argument on this point unpersuasive.

The plain language of the statute could be understood to endorse more than one method of counting employees, so it is ambiguous. Considering only the text of the statute—since it refers to counting those employees "with respect to whom the employer has an obligation to contribute"— it is possible that the statute would support counting employees based on the intervals by which the employer made contributions. However, this language could also simply be referring to the category of employees that are meant to be counted without directing that they be counted in relation to the intervals by which the employer made contributions. Therefore, a cumulative count of employees during the relevant period could also be supported by the text. Given the various reasonable interpretations, the statutory text is ambiguous as to the method of counting required to determine whether the BCI Exemption applies to an employer. Chickasaw Nation, 534 U.S. at 90.

The Court's conclusion on this issue is consistent with the Seventh Circuit's decision in Cent. States, Se. & Sw. Areas Pension Fund v. Robinson Cartage Co., 55 F.3d 1318 (7th Cir. 1995). In Robinson Cartage, the Seventh Circuit held that the plain language of § 1383(b)(1)(A) is ambiguous as to the time period that must be evaluated in applying the BCI Exemption. Id. at

1322. While the issue presented in this case is not about the relevant time period but the method of counting, the logic of Robinson Cartage nonetheless applies.

GE argues the Court should instead adopt the reasoning of Raytheon Co. v. Cent. States, Se. & Sw. Areas Pension Fund, No. 89 C 1010, 1989 WL 117919 (N.D. Ill. Sept. 27, 1989). In Raytheon, the District Court for the Northern District of Illinois held that the language of the statute unambiguously requires a cumulative approach. Id. at *6–7. However, the Seventh Circuit's opinion in Robinson Cartage, which held that the statute *is* ambiguous, supersedes Raytheon. 55 F.3d at 1322. Therefore, and for the reasons stated above, the Court finds the statute's plain language is ambiguous.

When the text of a statute is ambiguous, the Court looks to the purposes of the statute and its relevant legislative history. E.T.H., 833 F.3d at 937. The Court's analysis is aimed at providing a "sensible construction" that is "construed to effectuate the underlying purposes of the law." United States v. S.A., 129 F.3d 995, 998 (8th Cir. 1997).

Congress created partial withdrawal liability because a "major and sustained reduction in an employer's contribution base results in harm to the plan." S. COMM. ON LABOR AND HUMAN RESOURCES, 96TH CONG., 2D SESS., THE MULTIEMPLOYER PENSION PLAN AMENDMENTS ACT OF 1980: SUMMARY AND ANALYSIS OF CONSIDERATION 14 (Comm. Print 1980). However, in enacting MPPAA, Congress saw fit to create an exemption from withdrawal liability for employers operating in the building and construction industry because of the nature of the industry. Joint Explanation of S.1076: Multiemployer Pension Plan Amendments Act of 1980, as reprinted in 126 CONG. REC. 20189-20210 (1980). "The rule recognizes that in the construction industry work is generally tied to the area and not to a particular employer, so that an employer's ceasing work in the area normally does not remove jobs from the plan's contribution base." S.1076, The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration

11

98th Cong., 2d Sess. 21 (1980). Thus, the BCI Exemption was created to account for the transient nature of the construction industry and to not penalize employers whose contributions substantially decrease, because such reductions do not actually result in harm to the contribution bases of multiemployer pension plans. Id. Moreover, the BCI exemption ensures the maintenance and growth of multiemployer pension plans because it prevents building and construction employers from being discouraged from participating in such plans due to liability concerns. See id.

The Fund argues that withdrawal liability was created to protect the financial stability of multiemployer pension plans, and adopting a cumulative approach contradicts that purpose in this case because it is overly broad. (Doc. #25 at 23–24). The Fund argues that the reality of GE's operations is more properly represented by rolling monthly snapshots that present a moving picture of the number of field and shop workers employed by GE throughout the eight-year period. Id. at 26–28. And when examined this way, according to the Fund, it is clear that GE is not the type of employer that Congress meant to protect with the BCI Exemption because GE failed to maintain 85% of its boilermakers in the building and construction industry for most months of the relevant years. Id. (citing Doc. #25-8, Expert Report of John Redmond).

Conversely, GE argues allowing monthly snapshots would undermine MPPAA's purpose of protecting employers in the building and construction industry who regularly hire construction workers for short-term projects and then terminate them upon the project's completion. (Doc. #28 at 37–41). GE argues that the transient nature of employment in this industry requires an aggregate approach, because snapshots of employment in small intervals would inappropriately force construction employers into liability, contrary to the purposes of MPPAA. Id. Additionally, GE argues that Congress could have limited the BCI Exemption to employers with only field workers, but it created the "substantially all" test to encompass employers like GE that have mixed

operations (shop and field workers). Id. Therefore, as GE contends, applying a method of counting that excludes GE from the BCI Exemption would circumvent Congress's intent. Id.

Congress was aware that employment fluctuations are a regular part of the building and construction industry, and it created an exemption that was meant to reflect those fluctuations. See Joint Explanation of S.1076: Multiemployer Pension Plan Amendments Act of 1980, as reprinted in 126 CONG. REC. 20189-20210 (1980). A monthly snapshot method for counting employees would undermine Congress's intent because it would analyze employment by accounting for, and essentially removing, the transient nature of the employment numbers. Monthly snapshots mislead the Court from capturing the reality of a company's situation to focusing on certain moments in that company's employment. Therefore, the Fund's argument is at odds with the purposes of MPPAA. Meanwhile, an aggregate count reveals an employer's overall status—that is, whether they truly operate in the building and construction industry such that the BCI Exemption was meant to apply to them.

The Fund's argument would also require the Court to jump through multiple hoops not found in the statutory text to determine whether a company qualifies for the BCI Exemption. Under the Fund's approach, the Arbitrator would have to take 96 monthly snapshots of GE's employment, counting the number of field and shopworkers at 96 different times. (And perhaps in another case with different underlying facts, an arbitrator would take snapshots at three-month or six-month or yearly intervals.) Then, the Arbitrator would have to determine how many of those 96 snapshots need to show that GE had substantially all of its employees working in the building and construction industry. It is unreasonable to assume that the correct inference from the statute's silence is to insert these numerous levels of calculation. Conversely, GE's position calls for a simple, direct method of calculation that does not add greatly to the text of the statute. Based on the purposes of ERISA and MPPAA and the relevant legislative history, the most sensible

13

construction of the provision is that it requires a cumulative headcount of employees over the relevant time periods.

Even so, the Fund points to Robinson Cartage to argue that precedent supports periodic snapshots, not a cumulative headcount. In Robinson Cartage, the Seventh Circuit applied yearly snapshots to determine whether a company qualified for the BCI Exemption. 55 F.3d 1318, 1324–25 (7th Cir. 1995). However, Robinson Cartage provides this Court with limited persuasive authority, especially since the employer in that case exited and re-entered the building and construction industry during the eight-year period preceding its alleged partial withdrawal. Acknowledging this important factual distinction, the Seventh Circuit stated in its opinion: "We do not imply that this conclusion will be appropriate in all factual scenarios . . . . Other situations that do not involve similar forays into unrelated industries may require different results." Id. at 1324. In Robinson Cartage, the employer's exit and re-entry are what justified the use of yearly snapshots, but here, GE never exited the building and construction industry. Furthermore, Robinson Cartage did not reject the cumulative headcount approach as a permissible method of calculation. See id. at 1324–25. In fact, the court in Robinson Cartage actually considered both methods, stating the results of a cumulative calculation after stating the results of a yearly count. Id. at 1324 ("Further, if we compare *all of* Robinson's construction related CBUs *over this eight year period* (13,761), *against the total number* of CBUs for that period (25,746), we find that only 53% of Robinson's total CBUs were construction related in the period 1978–1985.") (emphasis added). Therefore, this Court is not persuaded to adopt the Fund's position based on Robinson Cartage.

Meanwhile, GE points to PSF Indus., Inc. v. Boilermakers-Blacksmith Nat'l Pension Tr., No. 20-CV-6143-FJG, 2021 WL 12262801 (W.D. Mo. Sept. 30, 2021) to support its position. In PSF Indus., the arbitrator decided that monthly snapshots were the proper way to determine

14

application of the BCI Exemption. Upon review, this Court reversed the arbitrator's decision, stating that the arbitrator "erred in deciding that he could consider monthly 'snapshots' of employee data over a ten year period." Id. at *9. The matter was remanded with instructions for the arbitrator to apply a cumulative method. The Fund argues that the Court's decision in PSF Indus. was misguided and incorrect. But the Fund raises the same arguments against PSF Indus. as it raises here to urge this Court to adopt monthly snapshots, which the Court finds unpersuasive.

Based on the foregoing explanation, for purposes of determining whether the BCI Exemption applies to a company, the proper method to count the number of employees is a cumulative headcount method.

### IV. GE Qualifies for The BCI Exemption

The parties agree that if this Court adopts the cumulative headcount method and finds that GE qualifies for the BCI Exemption as to the 70% Decline Claim, then GE also qualifies for the BCI Exemption as to the Chattanooga Claim. Specifically, during oral arguments the parties' conceded that, given the facts of this case (and the stipulated-to time periods for each claim), if the BCI Exemption applies to GE, it applies on both Claims. As explained above, the Court adopts the cumulative headcount method of calculation.

Next, the Court will evaluate the 70% Decline Claim using the cumulative approach. GE is a mixed employer, employing both shop and field workers. The parties have stipulated that shop workers are not in the building and construction industry, but field workers are in the building and construction industry. Therefore, the Court looks to how many field workers GE employed in the relevant periods as compared to the number of shop workers. If 85% or more of its boilermakers were field workers, then GE qualifies for the BCI Exemption.

From 2007 to 2014, GE employed a total of 15,644 boilermakers of which 402 were shop workers and 15,242 were field workers. (Doc. #25-2 at 5). Of the employees for whom GE had an

15

obligation to contribute to the Fund, 97.43% worked in the building and construction industry, which is above the substantially all threshold of 85%. Given the parties stipulations, and since GE employed substantially all of the employees for whom it had an obligation to contribute in the building and construction industry, GE qualifies for the BCI Exemption on the 70% Decline Claim. As a result, GE is not liable to the Fund on this claim. Since GE qualifies for the BCI Exemption as to the 70% Decline Claim, then GE also qualifies for the BCI Exemption as to the Chattanooga Claim. Accordingly, it is hereby

ORDERED Plaintiff's Cross-Motion for Summary Judgment (Doc. #27) is GRANTED and Defendants' Motion for Summary Judgment (Doc. #24) is DENIED. It is further

ORDERED the Arbitrator's decision is AFFIRMED.

IT IS SO ORDERED.

Dated: February 3, 2025  /s/ Brian C. Wimes
JUDGE BRIAN C. WIMES
UNITED STATES DISTRICT COURT